JOVITA PEREZ *v.* UNITED STATES

**No. 6402.**—Invoice dated Monterrey, N. L., Mexico, November 14, 1942.
Certified November 14, 1942.
Entered at Laredo, Tex., November 24, 1942.
Entry No. 1671.

(Decided October 3, 1946)

*Lamb & Lerch* (*John G. Lerch* and *Thomas J. McKenna* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the defendant.

KEEFE, Judge: These appeals for reappraisement involve an importation of 300 gallons of "El Masco" flavoring sirup from Mexico, contained in six barrels each of 50-gallon capacity. The sirup was invoiced at U. S. $51 per barrel and entered at the same price less nondutiable and c. i. f. charges. After such deductions upon entry, the net entered value of a unit of six barrels is U. S. $167. The cost of the six containers is included in that price. The sirup was appraised at a price of Mexican pesos 1045.42 per unit of six barrels, packed. The containers, which were of American manufacture, were

valued at Mexican pesos 72.46 per unit of six barrels, and included in the appraised unit value. The appraised value is shown to be equivalent in United States currency to $215.16.

At the trial of this case a considerable portion of the evidence introduced was documentary. Walter S. Mack, Jr., president of the Pepsi-Cola Co. and president of the Mexican-American Flavors Co., the exporter of the instant merchandise, testified that on account of the shortage of sugar in the United States and the fact that their stock pile of sugar, which was sufficient for the needs of the Pepsi-Cola Co., was, upon request, turned over to the Government, permission was obtained from the Mexican Government to erect a sirup plant in Mexico and to manufacture a flavored sirup there over a period of 5 years for export to the United States. The company made arrangements to purchase the surplus sugar raised by the Mexican growers. The sirup was manufactured as planned for a period of 13 months, then, because of an acute sugar shortage in Mexico, the company was forced to discontinue.

Before proceeding to manufacture the sirup, the witness testified that the selling price was figured. In that regard he testified substantially as follows: Adopting a unit of 300 gallons, or six 50-gallon barrels, it was found that the ingredients, including 1,850 pounds of sugar, would cost $115; and the manufacturing costs and overhead of the plant would be $15; total $130. The estimate of the life of the barrels and their cost per unit was figured as being $10. As the freight costs would be prepaid to customers throughout the United States, the average cost was worked out as being $45 per unit, as shipped from Monterrey, the place of manufacture in Mexico to the destination in the United States. The United States duties, consular fees, and brokerage were estimated at $50 per unit. A United States sugar tax of $10 per unit and a Mexican sales tax of $2 per unit, together with the cost of insurance, trucking, and handling of $5 per unit, brought the total of the other charges up to $112. In figuring the selling price a profit of $44 per unit was included, which was estimated by the witness to be about 33 per centum.

According to the witness, it was not possible for him to state whether or not an actual profit will eventually be realized from the Mexican operations for the reason that a liquidation of the assets in Mexico had not yet been completed. The witness further explained the unit sales price by stating that the venture was undertaken in order to keep the small bottlers of their Pepsi-Cola product in operation by supplying them with sufficient sweetening materials at a price which would allow them to exist, and it was figured that the maximum price they could afford to pay, in order to retail Pepsi-Cola for 5 cents a bottle, was $296 per unit of 300 gallons.

Exhibit 1 is an affidavit of Joseph W. Pepperman, the treasurer of

the Mexican-American Flavors Co., S. A., stating that he had charge of the preparations of all of the cost of production data of the flavoring sirup "El Masco"; that he is familiar with the Mexican market conditions and that products in the nature of sugar sirup of the same general character as "El Masco" capable of use in the manufacture of soft drinks are manufactured by Remigio Jasso Rodriguez and Industrias Unidas de Nuevo Laredo, S. A.; that the profit ordinarily added by producers of this type of product, which is in chief value of sugar, based upon sugar content and the cost thereof, was approximately 40 per centum of the raw material costs and fabricating labor, and that the profit ordinarily added by such producers, based upon sugar content and the cost thereof, and with about 10 per centum thereof as the usual and general expenses, was approximately 35 per centum of the raw material costs, fabricating labor, and usual general expenses. Affiant also stated the barrel costs. Attached to the affidavit as a part thereof are the cost of production sheets covering each of the 13 months of production, and the total costs, to wit, the cost of the raw materials and cost of direct labor; the usual and general expenses, including the plant expenses and general office expenses connected with the manufacture; the cost of the barrels, including freight, storage, reconditioning, insurance, etc.; the wages of the employees in the barreling of the product; and the actual selling expenses, including the consular fees, customs duties, brokerage fees, entertainment, state and federal sirup sales taxes, and the office expenses.

Prew Savoy, counsel for the Pepsi-Cola Co., testified that he is familiar with handling cost break-downs and analyzing costs of production; that he secured exhibit 1, affidavit of Mr. Pepperman, and a compilation of the cost figures; that such compilation was made under his supervision and that he worked continuously in its preparation; that all of the usual general expenses as found on the books of the Mexican company appear in the compilation, exhibit 1. There were other expenses, however, which Mr. Savoy stated were not usual and general, which do not appear in the cost of production sheets, such as freight-out hauling of 6,100,000 pesos; the write-down from the book figures on barrels of 2,000,000 pesos; the cost of removal of Mexican embargo on sugar of 65,000 pesos; and a 13-month period border expense of 100,000 pesos. The witness further testified that if item 1 included the cost of sugar and other ingredients, plus the cost of direct labor in producing the sirup, item 2 included the usual and general expense, and item 3 the cost of barreling per trip per unit, and there were added thereto the unusual and extraordinary expenses, the profit of the company, before taking into account any liquidation losses, based on the selling price of $296 per unit, would be 27 per centum.

Exhibit 6 is a report by S. J. Kennedy, Treasury representative, who made an investigation of the Mexican American Flavors Co., S. A., interviewing J. W. Pepperman and A. Villareal, the treasurer and the accountant of the firm, and personally inspecting the books and records. His investigation of the production costs substantiates, except for minor differences due principally to error, the cost of production sheets attached to exhibit 1. He was of the opinion that the overhead costs for the 13-month period should be taken as a percentage of the total cost of materials and labor for the period and prorated to each month because many of the overhead expenditures could not be properly charged against the sirup produced in the months in which the expenditures occurred, and on such basis the overhead amounted to 11.63972 per centum of the cost of the material and labor.

He was also of the opinion that the charge for packing should be $23.9637444 per unit of six barrels. Mr. Kennedy was also of the opinion that as the manufacture of sirup in Mexico was a war-born industry due to the shortage of sugar in the United States, it should not be classed as "usual" and therefore additions for overhead were not in the "usual" class.

The Treasury representative figured the cost of production by setting out $5,032, the total selling price of a carload of 17 units of sirup, deducting the nondutiable charges, the sugar tax, a duty at 20 per centum, and entitling $3,494.33, the remainder, as "dutiable value." He then figured the cost of materials and labor for such carload as $1,719.03, which he deducted from the so-called "dutiable value." From the sum of $1,775.30, then remaining, he deducted the cost of packing, $88.08, and labeled the balance, $1,687.22 as "profit." This he figured to be 98.15 per centum of the sum of the cost of materials, labor, and overhead.

Exhibit 2 is an affidavit of A. F. Longoria, the vice president of Industrias Unidas, stating that his company manufactured sirup for 10 or 12 months; that from his trade contacts the profit ordinarily added by producers was 40 per centum of the cost of the ingredients and direct or fabricating labor, and if the usual general expenses amounted to 10 per centum of the ingredients and labor, then the profit would be about 35 per centum; and that the profit added by the Industrias Unidas was approximately 18 per centum of the cost of the ingredients and direct or fabricating labor.

Exhibit 5 is another affidavit of A. F. Longoria, executed more than a year later at the request of the Government. Therein Mr. Longoria stated that he began producing flavoring sirups for two American producers in 1943 in an idle building in his plant; that in arriving at the percentages stated in his earlier affidavit, he had estimated the amounts after checking available records. In estimating the profit percentage, he stated that he did not take into account

any expenses or charges other than those directly related to the cost of materials and labor charges incurred in the manufacture of the sirup, and that overhead, administrative salaries, taxes, depreciation, etc., were not considered. Also, that his statement as to percentages other producers added to their costs as profit was based upon conversations with the other producers and such information was not of his own knowledge.

Exhibit 7 is a report made by Treasury Representative DeLagrave relative to the sugar sirup exported from Mexico by the Industrias Unidas, S. A., of Nuevo Laredo. Mr. DeLagrave interviewed O. L. Longoria, the president, and A. G. Leal, the manager of the company, and the information obtained from them, according to Mr. De-Lagrave's report, was verified from the company's books and records.

He found that the company was in the business of manufacturing lard, soap, cottonseed meal, cottonseed oil, ice, etc.; that there were many buildings, one of which had been purchased from Swift & Co., and was equipped with large tanks, boilers, pumps, and warehouse space, but had been idle for several years; that this idle plant was used in the manufacture of sugar sirup; that the company had only two American customers for its sirup who purchased all of its product; that the phosphoric acid and caramel coloring used in the manufacture of the sirup was supplied by these customers without cost to the manufacturer and also an employee of each of the importers was working at the plant at the importers' expense in manufacturing the sirup; that agreements with the purchasers indicated that a profit of from 20 to 35 per centum to the manufacturer was contemplated and if the price of sugar rose to a point where such profit could not be realized, then the price of the sirup was to be revised upward.

The report further shows that the production of the sugar sirup was a side line and complete accounting records were not established for sugar sirup transactions; that the invoice prices represented what the manufacturer actually received and did not include the price of materials supplied by the importer nor the supervisory labor. The Vess Beverage Co. paid a price of $0.40 per gallon while the Red Rock Bottlers paid $0.4189237 and later on $0.60 per gallon. The sugar costs resulted in the difference in price to the two importers, as the Vess Beverage Co. sirup was produced from sugar purchased from the Sugar Union which sold sugar at a fixed contract price, while the Red Rock Bottlers' sirup was produced from sugar purchased from local dealers whose prices greatly fluctuated. The manufacturer did not keep any cost of production records as to the manufacture of sugar sirup, but he had his original calculations as to production costs. The costs of the materials (sugar) at 352 pounds per barrel, at a price of $4.11 per 100 pounds, equaled a cost per barrel of $14.47. The Treasury representative noted in his report, however, that the actual

cost of the sugar purchased from the Sugar Union was $4.73 per 100 pounds rather than $4.11, which would bring the raw material cost up to $16.65 per barrel. The labor costs supplied by the manufacturer were estimated at 50 cents per barrel. The overhead and profit, however, was not separated by the manufacturer because the overhead was considered to be negligible. Therefore the Treasury representative was of the opinion that the legal limit of 10 per centum would apply. The manufacturer treated the difference between the cost of materials and labor and the selling price as profit.

The cost of production based on the manufacturer's estimate at the time production was undertaken was figured by the Treasury representative as materials $14.47, labor $0.50, overhead $1.49, total $16.46. Subtracting that sum from the selling price of $20, less included expenses of $0.60, or $19.40, the remainder of $2.94 per barrel was stated to be the profit, which equaled 18 per centum. It was also noted in the report that if the actual cost of materials was used, to wit, $16.65 per barrel, plus labor, plus 10 per centum overhead of $1.71, the manufacturing cost would be $18.86 per barrel and the profit only $0.54, or 3 per centum.

Mr. A. F. Longoria, vice president of Industrias Unidas de N. Laredo, S. A., testified that to his personal knowledge everything he stated in his first affidavit was true; that in making his estimate of the cost of production he did not take into consideration any depreciation of machinery because it consisted only of a 1,000-gallon tank and an oil burner, and the depreciation was too minor to consider; that he did not account for any salary for himself as he had devoted such little time to the production of the sugar sirup, nor did he consider any taxes; and that when he signed the second affidavit at the insistence of the Government, he had made it plain to the officials just what he had not included in arriving at his cost of production and had agreed that he was willing to sign an affidavit to that effect. An affidavit, according to the witness, was drawn up by the Government officials, which he hurriedly read and signed, failing to note the significance of the statement contained in the affidavit, particularly the portion underlined in the quotation following:

In stating the profit percentage which is contained in the aforesaid affidavit, affiant did not take into account any expenses or charges other than those directly related to the costs of materials and labor charges incurred in manufacturing such flavoring syrup. *Overhead, administrative salaries, taxes, depreciation, etc. were not considered.* [Italics not quoted.]

Exhibit 3 is an affidavit of Remigio Jasso Rodriguez, who stated that he manufactured sirup for soft drinks for 1 year; that his profit was based on the cost of ingredients and direct or fabricating labor and was approximately 40 per centum. From his contact with the trade he further stated that the profit ordinarily added was from 40

to 50 per centum of the cost of the ingredients and fabricating labor, and if the usual general expenses amounted to 10 per centum of such cost, then the profit would be from 36 to 45 per centum of the cost of the ingredients, direct or fabricating labor, and usual general expenses.

The affiant, Rodriguez, was not conversant with the English language and the affidavit was first presented to him in the Spanish language. S. V. Gonzalez, who reads and writes both the English and Spanish languages, was present when Rodriguez executed the affidavit, exhibit 3, read the affidavit written in Spanish to Rodriguez and checked it with the English translation, exhibit 3, which was signed by the affiant, and in an affidavit, exhibit 4, Gonzales stated the foregoing facts and affirmed that the translation was an exact copy of the Spanish affidavit.

Exhibit 11 consists of a second affidavit of Mr. Rodriguez, together with its translation into the English language from the Spanish, wherein the affiant states that he made a statement before the American consul at the request of Mr. Pepperman as to the costs, expenses, and profits obtained in his factory in the manufacture of flavoring sirups; that in making such statement he relied on his memory and his figures were based on his practice or experience and the prevailing circumstances relative to that period in the manufacture of sirup; and that although the figures were not taken from his books, they were based on the approximate facts.

Exhibit 8 is a report by Treasury Representative DeLagrave of an interview with Rodriguez and personal inspection of his books. According to the Treasury representative, Rodriguez owns a bottling plant known as La Nacional and he obtained permission in 1943 to manufacture sugar sirups for use in the manufacture of beverages and to export them free of all taxes. Also, to import certain fruit extracts, phosphoric acid, and cumorina free of import duty. He manufactured the sirup by a cold-water process by means of only two machines, a mixer and a filler. The sirups were flavored and completely prepared. With the addition of carbonated water, soda beverages were produced therefrom. No records were kept of his production costs. During the investigation, Mr. Rodriguez calculated his costs for Mr. DeLagrave. There were shipments which totaled 1,433 barrels of 50 gallons each. Each barrel contained sugar valued at 99 pesos and flavoring materials at 22 pesos. The labor per barrel was estimated at 10.50 pesos, and his overhead expenses at 21 pesos per barrel. There were other overhead expenses, however, which were classed as extraordinary, estimated to amount to 7 pesos per barrel. The selling price, according to Mr. Rodriguez, was fixed to realize a profit of 42.50 pesos per barrel. On the foregoing basis the cost of production would be 195 pesos per barrel or about $40. Other expenses included in the selling price amounted to about $1 per barrel

and no separate account of packing costs were made, the labor of packing was treated as an item of labor and included in his estimate of 10.50 pesos per barrel for labor. The Treasury representative further stated, in reference to the cost of production figures, that—

It was pointed out to Mr. Rodriguez that the overhead figure he gave me did not agree with those given in the affidavit he made before the American Consul at Nuevo Laredo. This affidavit referred to in Mexico City Report 511/310 of May 8, 1944, and Mexico City Report 511/179 of May 8, 1944, gives as his overhead and profit 10% and 36% to 45%, respectively. Mr. Rodriguez explained that the calculations he had made for his affidavit had not been made as carefully as those for the present investigation. These new calculations result in the figures of 15.9% for overhead and 24% for profit, the latter being figured on cost of materials, labor and overhead.

Exhibit 9 is a report of Treasury Representative Kennedy relative to the manufacture of sugar sirups by the firm of Extractos Y Sabores S. de R. L., of Monterrey, Mexico. The Treasury representative interviewed William E. Hughes, the director general of the company, and inspected his regular books of account and other records. The company was found to manufacture a sweetening compound consisting of a mixture of sugar, water, glucose, acid, and bicarbonate of soda, which was used as a base for soft drinks. It also manufactured a flavored sirup, consisting of a mixture of sugar, water, caramel, and phosphoric acid; the caramel being added as coloring material and the acid to invert the sugar. Another article known as chocolate base was composed of sugar, water, cocoa, salt, Irish moss, and tartaric acid, and a chocolate fountain sirup was composed of sugar, cocoa, salt, and tartaric acid.

The Treasury representative stated, relative to the cost of production of sweetening compound, as follows:

Mr. Hughes had no data as to cost of production of the sweetening compound, but he said he had once computed his net profit at $1500 U. S. cy. per carload of 50,000 lbs., on a selling price of 7¢ a pound. He estimated that his overhead was always slightly in excess of 10% of costs of materials and direct labor, and that his profit was always in excess of 40% of total materials, labor and overhead. It will be noted that the profit of $1500 is about 75%.

It was not shown in the report how such percentage for profit was derived. However, a selling price of 7 cents per pound for 50,000 pounds totals $3,500. If the profit was $1,500, the Treasury representative must have accepted the difference between the total selling price and the profit, to wit, $2,000, as representing "all costs and expenses incurred by such manufacturers or producers in connection with such merchandise," the formula set out in T. D. 48860(3) by the Treasury Department, by means of which "profit" should be figured, inasmuch as $1,500 is 75 per centum of $2,000. The Treasury representative further noted in connection with the sweetening compound that "Some of the charges for handling barrels may be part

of the dutiable value of the merchandise, but the manufacturer's records were not kept in sufficient detail to enable me to identify such charges."

Attached to the report were data taken from various invoices of sales of the sweetening compound. These data disclose that from December 17, 1942, to January 9, 1943, the price was $4.39 per hundred pounds. On January 21, 1943, the price was $5.20 per hundred pounds. From January 23 to March 1, 1943, the price was $5 per hundred pounds. From March 11 to May 13, the prices varied from $5.20, $5.30, $5.80 to $6.30 per hundred pounds. The remainder of the shipments made from June 25 to November 29, 1943, was invoiced at a price of $7 per hundred pounds and constituted 26 out of a total of 68 shipments.

As to the flavored sirup, there were also no data from which cost of production could be obtained but from data showing the cost of sugar, the caramel and acid, direct labor and a 10 per centum overhead, the estimated labor of packing, the Treasury representative was able to reduce such costs to the cost per gallon and therefrom found that the difference between the selling price and costs of materials, labor, and overhead, was about 10.80 per centum. He noted, however, that the sugar used was bought on the black market and was more expensive than legally procured sugar. The report also shows that there were no cost of production figures available for the manufacture of chocolate base or chocolate fountain sirup but accepted the manufacturer's statement that he operated on the basis of an 8 per centum profit.

Exhibit 10 consists of an affidavit of William E. Hughes, interviewed by Treasury Representative Kennedy as shown above. This affidavit was procured by the Government after the first hearing of this case. Therein the affiant states that his company manufactured a flavored sirup composed of sugar, phosphoric acid, and caramel as ingredients. This profit was calculated by the Treasury representative as about 8 per centum. As to the manufacture of sweetening compound, composed of sugar, water, glucose, acid, and bicarbonate of soda, the affiant stated that the sweetening compound was of like character to the flavored sirup here under consideration; that it was manufactured for exportation to the United States, the shipments beginning in December 1942 and terminating in November 1943. The affiant further states relative to the cost of production as follows:

* * * Deponent's records concerning the costs, expenses, and profits chargeable to the manufacture of sweetening compound covered approximately the same items as those kept by the company for the flavored syrup referred to herein. Deponent, however, has computed that the profit added in manufacturing and selling the sweetening compound was approximately seventy-five per centum of the cost of materials, labor and overhead. *This computation was made directly from the records kept by deponent in the ordinary course of business,* and sales made

during the period of operations realized a profit which corresponded to the amount added; namely, seventy-five per centum.   [Italics not quoted.]

It was conceded by the parties hereto that the cost of production was the proper basis of appraisement.   The plaintiff conceded that the exporter herein made the majority of sales in the country of production for export to the United States.   It was agreed between counsel that the figures in exhibit 1 and in the special agent's report, exhibit 6, are representative of the cost of materials and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise at a time preceding the date of exportation of the particular merchandise under consideration, which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business.   In other words, the figures are representative of the costs in the instant shipment as well as in all other shipments of the exporter herein, and it was agreed that no question would be raised because the actual costs occurred subsequent to the time of this or other importations.

Counsel for the plaintiff pointed out that the special agent in his report, exhibit 6, found a unit price of $90.58 based on carload lots, whereas the unit price as shown by the plaintiff in exhibit 1 is $89.70, and stated that the difference in cost is due to the inclusion of certain charges made in connection with the sugar after its purchase, which the plaintiff charged in its accounts to overhead.   Such charges consisted of insurance, storage, and car handling costs, and it was contended that such costs are overhead charges rather than items to be charged to the cost of materials.

Counsel for the plaintiff conceded that $88.08 represented the cost of containers per carload lot of 17 units, which is equal to $5.18 per unit of 6 barrels.

Counsel for the plaintiff contends that the proper cost to be considered in determining the cost of production is the cost of materials and fabrication of $89.70 per unit; that the usual general expenses to be charged amounts to $8.97, being 10 per centum of the cost of materials and fabrication, inasmuch as the actual cost of general expenses amounted to only $8.67 per unit, which is less than the statutory 10 per centum; and that $5.18 per unit should be accepted as the cost of containers, the total costs of production outside of the "profit" coming to a total of $103.85.

Counsel for the plaintiff explains that the difference between the entered and appraised values results from the methods employed in determining the addition of profit, the appraiser following the Treasury Department's interpretation of profit appearing in T. D. 48860, and under such interpretation he determined the profit of the exporter's shipments, completely ignoring the fact that there were other pro-

ducers of the product in the country of exportation. It is contended on behalf of the plaintiff that the profit which is added must conform to the statutory formula, section 402 (f) (4), Tariff Act of 1930, to wit—"which ordinarily is added * * * by manufacturers or producers in the country of manufacture * * * who are engaged in the production or manufacture of merchandise of the same class or kind." It is further contended that the profit to be added is not the profit of the individual concern exporting the merchandise but, according to the statute, it must conform to the profit which was ordinarily added by manufacturers in the same country as to merchandise of the same class or kind; that the profit of the shipper could not be resorted to unless there was no other manufacturer of goods of the same class or kind in Mexico; and that the profit usually or ordinarily added by producers of the same class of merchandise ranges between 14½ to 16 per centum of the costs of material, fabrication, and the usual general expenses.

Counsel for the Government contends that section 402 (f) (1) provides that the cost of materials must be determined at a time preceding the date of exportation of the merchandise at bar and although section 402 (f) (4) is silent as to the period during which the profit is to be added, the same period of time as applied to the cost of materials should be used in determining the profit, because the statute specifies a "profit which ordinarily is added" thus limiting the time under consideration to that of the manufacture of the merchandise. In other words, the profit to be added to the cost of materials, labor, and usual general expenses should be the profit ordinarily added at a time preceding the date of exportation of the particular merchandise under consideration under the theory that profit is an item which must be added before an article could be sold and exported.

It is further argued by the Government that the profit ordinarily added is the difference between the costs and the selling price, citing Cottman v. United States, 20 C. C. P. A. 344, T. D. 46144, and the method of calculation used by the appraiser in his finding of profit is claimed to be the proper method upon the theory that in determining the profit to be added, consideration must be given to the profit added by all the manufacturers or producers of the merchandise including the manufacturer or producer of the goods in question, and ascertainment of profit, which is ordinarily added, can be made only from the majority of sales in the country of production. As it is conceded that the exporter of the instant merchandise made the majority of sales in the country of production for export to the United States, it is the Government's theory that the profit made by said exporter is the only profit that can be considered in determining the profit ordinarily added in the industry, and that such profit is equal to

98.15 per centum of the cost of materials, fabrication, labor, and general expenses of the merchandise, and when added thereto, represents the cost of production returned by the appraiser as the value of the merchandise.

Section 402 of the Tariff Act of 1930, so far as here pertinent, provides as follows:

**SEC. 402. VALUE.**

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

(3) If the appraiser determines that neither the foreign value, the export value, nor the United States value can be satisfactorily ascertained, then the cost of production;

\* \* \* \* \* \* \*

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

The Acting Commissioner of Customs issued "To Customs Appraising Officers and Others Concerned" an interpretation of the terms "usual general expenses" and "profit" in section 206, Antidumping Act of 1921, published in T. D. 48860, and reading in part as follows:

The Bureau has been asked to rule that the terms "usual general expenses" and "profit which is ordinarily added", as they appear in section 206 of the Antidumping Act of 1921 (U. S. C. title 19, sec. 165), contemplate only expenses and profit which may be attributed to the creation of merchandise, and not those attributable to its distribution and sale. \* \* \*

\* \* \* \* \* \* \*

After a careful consideration of the terms of the statute, its legislative history, and pertinent judicial decisions, the Bureau has reached the following conclusions:

(1) The "cost of production" contemplated by the statute is a constructive

"foreign-market value" as the latter term is defined in section 205 of the Antidumping Act of 1921 (U. S. C. title 19, sec. 164).

(2) The "usual general expenses" contemplated by paragraph (2) of section 206 are all of the *usual* expenses incurred by the manufacturer or producer of the particular merchandise under consideration in connection with the creation, storage, sale, and distribution of merchandise which is identical or substantially identical with the particular merchandise under consideration except those usual expenses which are covered by paragraphs (1) and (3) of such section.

(3) Under paragraph (4) of section 206 the "*profit which is ordinarily added in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the same general trade as the manufacturer or producer of the particular merchandise under consideration*", *is the usual difference between the manufacturers' or producers' selling prices of such merchandise of the same general character and all costs and expenses incurred by such manufacturers or producers in connection with such merchandise.* [Italics in paragraph (3) not quoted.]

The questions presented here are: First, should the item of profit in the cost of production formula, section 402 (f) (4), *supra,* be determined in accordance therewith, or should the foregoing Treasury Department's interpretation be followed; second, should the addition for profit reflect that percentage ordinarily or usually added by manufacturers in the country of production at a time preceding the date of exportation, or should it consist of the actual profit realized upon the sales of merchandise; third, should the percentage added for profit of the manufacturer making the greatest number of sales in wholesale quantities be determined by taking into consideration the sales of the exporter whose cost of production is being determined under the statutory formula, when the exporter made the majority of sales; and fourth, what "profit" is established by the record?

As to profit, I am of the opinion that the clear implication of the statutory language is that the item of profit in the cost of production formula is required to represent at least 8 per centum of the cost of the materials and labor necessary to manufacture such or similar merchandise, plus the general expenses usually incurred in the production thereof by the particular manufacturer of the merchandise under consideration. In *Austin, Baldwin & Co.* v. *United States,* 7 Ct. Cust. Appls. 186, T. D. 36505, the court stated that "the appraising officer must take into account the cost of fabrication, the cost of materials, and the general expenses in the amount which, using every available means in his power, he finds them actually to be."

The addition made for profit, however, is further restricted as it is required to be equal to the profit which ordinarily is added by other manufacturers in the country of production who manufacture merchandise of the same general character. To be "equal" is defined as being "the same in magnitude, quantity, degree, amount, worth, value, or excellence." (See Century Dictionary and Cyclopedia.)

Therefore, not a higher nor a lower, but the same proportionate amount or percentage of profit is required by statute to be applied in the cost of production formula as is applied by other manufacturers of merchandise of the same general character as the merchandise under consideration. The profit to be added in determining the cost of production of the sirup in question, therefore, is measured by the percentage of profit added by manufacturers in the country of production other than the exporter of the instant merchandise. (See *United States* v. *Heemsoth-Kerner Corp.*, 31 C. C. P. A. 75, C. A. D. 252.) It would seem, therefore, that the interpretation announced by the Treasury Department in T. D. 48860 as to the method to be used in finding the profit to be added is not in accordance with the terms of the statute. In *United States* v. *Vandegrift*, 16 Ct. Cust. Appls. 398, T. D. 43120, the court stated that—

* * * The invoice price, being the purchase price, might be higher or lower than the cost of production, owing to the nature of the contract of purchase or the state of the market. The statute above quoted requires the cost of production to be computed from several elements: First, the cost of materials and of fabrication; second, the usual general expenses, not less than 10 per centum; third, the cost of containers; fourth, an addition for profit, not less than 8 per centum. * * *

\* \* \* \* \* \* \* \*

We held, also, in *Turner & Co.* v. *United States*, 12 Ct. Cust. Appls. 48, T. D. 39997, that the selling price of an article was not the test as to whether it was the component material in chief value of an article made in part of it, but that whether it was or was not such component material of chief value depended upon its cost of construction, which cost was not to be confused with selling price.

The court there stated that the cost of production found by the appraiser and approved by the reappraising justice was the purchase price or invoice value. This method for finding the cost of production was not approved by our appellate court, which held that the invoice value alone is not a sufficient basis upon which to fix the cost of production as required by the statute.

If the argument of Government counsel is sound that the profit to be added should be that ordinarily added at a time preceding the date of exportation of the particular merchandise under consideration, upon the theory that a profit must be added before an article could be sold, a profit determined by finding the difference between the costs and the selling price as in the appraisement before us is clearly erroneous. The *Cottman* case, *supra*, is not an authority for approving such method of calculation. In that case the court held that cost of production had not been established under the statutory formula. Although the court commented on the fact that, inasmuch as there was no producer of rock phosphate other than the Government agency, an allowance to be made for profit would be the profit ordinarily added by that agency in selling its product and that "sales to European

countries should be taken as the measure of the profit which is ordinarily added," this dictum was not intended to be taken as authority for holding that the item of profit in statutory cost of production should be determined by finding the difference between the selling price and the cost of materials, manufacturing costs, and overhead, but rather that such method could be used to determine whether or not dumping duties were applicable.

I am further of the opinion that the cost of production method of appraisement was adopted by Congress and included in the statutory definitions of value specifically for the determination of value when a value could not be found for imported merchandise under the definitions of foreign, export, or United States value, which were made contingent upon offers for sale or sales to all purchasers. The cost of production formula is entirely independent of the market value or price at which such or similar merchandise is freely offered for sale to all purchasers in the home market or for export. See *United States* v. *Vandegrift*, 16 Ct. Cust. Appls. 398, T. D. 43120.

Congress set as a standard for the determination of the cost of production, the cost of materials and fabrication thereof at a time preceding the date of exportation, the usual general expenses incurred in the manufacture of such or similar merchandise, the cost of the containers of the particular merchandise exported, and all other export costs thereof, and included therein an addition for profit, especially providing that such profit shall be "equal to the profit which *ordinarily is added*, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind." [Italics not quoted.] However, a minimum limit was set upon profit to be added at not less than 8 per centum of the cost of materials, the fabrication thereof, and the overhead incurred in the manufacture of the imported merchandise.

Had Congress intended that the item of profit should be commensurate with the profit derived by the manufacturers or producers or exporters of the same class or kind of merchandise who made the greatest number of sales, it could easily have so stated in the statute. The courts have held that in the event there is no other manufacturer of such or similar merchandise in the country of production, the profit ordinarily added by the manufacturer of the merchandise exported may be accepted as part of the cost of production. See *United States* v. *Maier*, 18 C. C. P. A. 409, T. D. 44679. Under the Government's theory, a cost of production would be incapable of being established in the event the sole manufacturer of goods in the country of production had made no previous sales.

Reaching the conclusion that the profit to be added is to be measured by the profit ordinarily added by other manufacturers of the same class or kind of merchandise rather than a profit calculated by taking the difference between the invoice value or selling price and the cost of materials, fabrication, and overhead, and subtracting therefrom the packing, the question arises as to the congressional intent in the statutory language—"equal to the profit which ordinarily is added." Was it the intent of Congress to have the actual profit realized by the various producers of the merchandise adopted when such actual profit of each producer may necessarily vary because of labor conditions or cost of materials or by reason of other unusual expenses not a part of the cost of production formula so that no standard may be set, or did Congress intend to set a standard free from local factors through which a staple cost of production may be readily ascertained? I am inclined to the latter view. Were such not the congressional intent, the profit formula in the statute would not describe profits which were "equal to the profit which ordinarily is added" but would provide for a profit "equal to the profit ordinarily derived or realized by the manufacturer, etc."

The situation here before the court is a graphic example of the confusion which would result from the adoption of actual profits of the various producers. The Industrias Unidas was aware that the profit ordinarily added by the industry was 35 per centum, but the profit actually realized by that firm was stated to be only 18 per centum. The Treasury representative found, however, that because sugar was higher than estimated, the percentage of profit had shrunk to only 3 per centum. Rodriguez also was aware of the profit ordinarily added by the industry, stating that it ranged from 36 to 45 per centum. The Treasury representative reported, however, that his actual profits, because of a higher overhead than estimated, were 24 per centum in respect to one similar product. Another similar product, because of less ingredients, actually realized a profit of 28 per centum.

The firm of Extractos Y Sabores, S. de R. L., according to its director general, manufactured several like products from which profits were actually realized ranging from 8 per centum to 75 per centum. However, according to the Treasury representative, the cost of materials, labor, and overhead of the material upon which affiant declared he made 75 per centum was $2,000 for 50,000 pounds. The sale prices ranged from 4.39 cents a pound to 7 cents. Figuring back from the selling price of 7 cents a pound, which would include all costs, usual and unusual, 75 per centum would appear as the profit but on a selling price of 4.39 cents a pound, the profit would amount to only 8 per centum.

Therefore, were profits based on the selling price to be adopted,

it is clear that it would be impossible to determine the profit applicable. To accept the highest profit, or the average profit, clearly would be contrary to the statute. The evidence fully establishes, however, that the profit ordinarily added in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production, who are engaged in the production or manufacture of the same class or kind of merchandise, was 35 per centum and I am of the opinion, in order to arrive at the proper cost of production of the merchandise at bar, that to the sum of the cost of the ingredients, the fabrication, labor, and the usual and general expenses incurred in the manufacture of the merchandise at bar, 35 per centum should have been added as representing a profit equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in Mexico who were engaged in the production or manufacture of merchandise of the same class or kind during the 13-month period in question.

In view of the foregoing, I am of the opinion that the statute provides the cost of production shall consist of four elements as set out in section 402 (f), *supra;* that in order to comply with the statute each of subparagraphs (1), (2), (3), and (4) must be separately established; that the difference between the selling price, less packing costs, and the costs found in accordance with subparagraphs (1) and (2), does not reflect the profit intended by Congress as an element in the cost of production; that the profit applicable is that ordinarily added by the industry rather than the actual profit realized by the various producers; and that the percentage added for profit bears no relation to sales in the home market or for export.

For the reasons stated I find the facts to be as follows:

1. That the merchandise herein consists of "El Masco" a sugar flavoring sirup, imported from Mexico during a period of 13 months beginning November 1942 and ending November 1943.
2. That there was no foreign, export, or United States value.
3. That the cost of production was the proper basis to be used for the finding of value under the provisions of section 402, Tariff Act of 1930.
4. That the cost of materials and fabrication in the production of the particular merchandise in question during said 13-month period is $89.70 per unit of six barrels of 50 gallons each, as claimed by the plaintiff.
5. That the usual general expenses were less than the statutory 10 per centum of the cost of the particular merchandise under consideration, and therefore the amount applicable herein is 10 per centum of the amount shown in paragraph 4, or $8.97.

6. That the cost of packing and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States, was the amount agreed upon between counsel, to wit, $5.18 per unit of six barrels.

7. That the profit applicable to the merchandise at bar as ordinarily added in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of Mexico who were engaged in the production or manufacture of the same class or kind of merchandise is 35 per centum of the sum of the cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such merchandise at a time preceding the date of exportation of the particular merchandise herein which would permit the manufacture or production of the particular merchandise under consideration in the usual course of business; and that such profit amounts to $31.40 per unit of six barrels.

8. That the cost of production of the merchandise at bar during the 13-month period is the sum of the amounts shown in paragraphs 4, 5, 6, and 7, or $135.25 per unit of six barrels of 50 gallons each.

I conclude, therefore, as a matter of law, that the value of the merchandise is as set forth in paragraph 8 of the findings of fact, and judgment will be rendered accordingly.